IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD SCOTT MAGEE,                    )
                                        )
                    Plaintiff,          )
                                        )
          vs.                           )          Civil Action No. 10 - 882
                                        )          Judge Nora Barry Fischer
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )

## MEMORANDUM OPINION

## I.      INTRODUCTION

Plaintiff, Richard S. Magee, ("Plaintiff") brings this action pursuant to 42 U.S.C. §

405(g), seeking review of the final determination of the Commissioner of Social Security ("the

Commissioner") denying his application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Title II and XVI of Social Security Act, 42 U.S.C.

§§ 1318-1383 (the "Act").  This matter comes before the Court on cross-motions for summary

judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure.

(Docket Nos. 9, 11).  The record has been developed at the administrative level.  For the

following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is

AFFIRMED.

## II.     PROCEDURAL HISTORY

Plaintiff filed applications for DIB[1] and SSI[2] on October 12, 2007 and again on May 2, 2008, claiming disability beginning November 26, 2006.  (R. at 127, 129, 133, 138, 145).  His claim was denied on September 9, 2008, (R. at 64-85), and Plaintiff filed a request for review on October 27, 2008.  (R. at 86-87).  Plaintiff's request for a hearing was granted, and a hearing was held before Administrative Law Judge Brian W. Wood in Mars, Pennsylvania on September 14, 2009, where Plaintiff was represented by Christine M. Nebel, Esq.  (R. at 89-110, 11-32).  ALJ Wood issued an unfavorable decision on October 7, 2009.  (R. at 38- 50).  On May 13, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's October 7, 2009 decision the final decision of the Commissioner.  (R. at 1-3).

The instant action was initiated when Plaintiff filed a Complaint in this Court on July 2, 2010, pursuant to 42 U.S.C. § 405(g) for claims under Title II and Section 1631(c)(3) for claims under Title XVI.  (Docket No. 3).  Defendant filed his Answer on September 7, 2010.  (Docket No. 4).  Plaintiff's Motion for Summary Judgment and accompanying Brief were filed on October 25, 2010 (Docket No. 9, 10).  Defendant's Motion for Summary Judgment and accompanying Brief were filed on November 15, 2010.  (Docket No. 12).

## III.  STANDARD OF REVIEW

Judicial review of the Commissioner's final decision on disability claims is provided by statute.  42 U.S.C. §§ 405(g)[3] and 1383(c)(3)[4].  Section 405(g) permits a district court to review

---

[1] Citations to Docket Nos. _ through _-_, the Record, *hereinafter*, "R. at _."
[2] Plaintiff's applications for DIB and SSI on October 12, 2007 and May 2, 2008 are largely the same absent some minor additions.  (R. at 127-129, 133, 138, 145).
[3] Section 405(g) provides, in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a

2

transcripts and records upon which a determination of the Commissioner is based.  Because the standards for eligibility and judicial review under Title II (42 U.S.C. §§ 401-433, regarding DIB) are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383(f), regarding SSI), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 432, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a).  *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d Cir. 2002).

When reviewing a decision denying DIB and SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact.  *Burns*, 312 F.3d at 118.  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate."  *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  Further, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  *See* 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record.  *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion [...] so long as the agency's

---

> civil action [...] brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides, in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings"). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423 (d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986).

An ALJ must utilize a five-step sequential analysis when evaluating the disability status of a claimant. 20 C.F.R. § 404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1 (*see* 20 C.F.R. §§ 416.920(d), 416.925, 416.926); (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given the claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful

activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## IV. STATEMENT OF FACTS

### A. *General Background*

Plaintiff was born on February 20, 1961. He alleges disability since November 26, 2006, when he was 45 years of age. (R. at 128). He has never married, has no children, and presently lives with his parents in their home in Butler, Pennsylvania. (R. at 127-128, 134). Plaintiff graduated from Knoch High School and also completed welding training at Airco Technical Institute. (R. at 229, 167, 234).

Plaintiff's father is a retired mailman, and his mother worked at a financial agency. (R. at 234). He has one younger sister. (*Id.*). He claims that his relationship with his father is strained and tense, because his father used to physically abuse him by beating him with a belt as a child. (R. at 223, 228). He also feels that his father favored his sister. (R. at 229). Yet, Plaintiff considers his family as his only support system. (R. at 223). For example, his parents usually have to remind him to pay his bills. (R. at 202).

Presently, Plaintiff is employed as a part-time delivery driver by Thoma Meat Market, Inc., where he earns between $2400 and $2700 per month. (R. at 147-149). His past work experience includes a variety of positions, including employment with an embroidery service, several construction companies, an asphalt and paving company, a demolition crew, a home improvement group, a custom building and remodeling corporation, a development group, a golf course, and most recently the meat market. (R. at 152-157). This type of work is considered semi-skilled with the exception of Plaintiff's work as a carpenter, which is considered skilled.

5

(R. at 28). However, Plaintiff has not maintained consistent employment with the same employer for more than six to eight months at one time because he has difficulty motivating himself to go to work. (R. at 231). He has also been fired by many of his previous employers due to his failure to appear for his scheduled shifts. (R. at 182, 229, 231).

### B. Plaintiff's Medical Background

In Plaintiff's applications for benefits, he claims disability resulting from his mental impairments. (R. at 133, 138, 127-29, 145). Hence, the Court will only consider Plaintiff's medical background regarding his mental impairments at this time.

#### 1. Butler Memorial Hospital: February 19, 2007 - February 22, 2007

Plaintiff was admitted to Butler Memorial Hospital with increasing depression and complained that he was unable to afford his medications for his bipolar disorder[5] and multiple psychosocial stressors. (R. at 223). Dr. Thomas Shetter, his primary care physician, treated him upon his arrival, and Dr. John Soffietti oversaw Plaintiff's treatment upon his release. (R. at 223, 225, 228). Initially, Dr. Shetter diagnosed Plaintiff with possible hypertension,[6] and bipolar disorder, and he noted Plaintiff's history of cigarette smoking. (R. at 225). Plaintiff was evicted from his apartment the day before he visited the hospital, causing him to move back in with his parents. (*Id.*). He has a history of a back fracture and multiple orthopedic procedures, but he has recovered without any residual symptoms. (*Id.*). During previous outpatient sessions, he was

---

[5] "Bipolar disorder" is "an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. The DSM (Diagnostic and Statistical Manual of Mental Disorders) specifies the commonly observed patterns of bipolar I and bipolar II disorder and cyclothymia." Stedman's Medical Dictionary 568 (28th ed. 2006).

[6] "Hypertension" is "high blood pressure; transitory or sustained elevation of systemic arterial blood pressure to a level likely to induce cardiovascular damage or other adverse consequences." Stedman's Medical Dictionary 927 (28th ed. 2006).

diagnosed with bipolar disorder and treated with lithium[7] briefly before doctors started him on Paxil[8] in conjunction with Lamictal.[9] (*Id.*). He noted that the medications were an effective combination but he could no longer afford them due to financial constraints. (*Id.*).

Dr. Soffietti found Plaintiff to be alert, fluent, and sad, but noted that Plaintiff had a slowed psychomotor. Plaintiff did not manifest any formal or informal thought disorder, and while he reported having fleeting suicidal thoughts, he adamantly denied any intent by stating, "I'm afraid of dying." (R. at 224). Dr. Soffietti diagnosed Plaintiff with bipolar disorder, type II, depressive type,[10] because of his deteriorating social situation, loss of his job, and bankrupt financial situation. (*Id.*). He restarted Plaintiff on Lamictal at a smaller dose and lithium as well. (*Id.*). Because Plaintiff is merely a social drinker, Dr. Soffietti ruled out episodic alcohol abuse, however he noted that Plaintiff had an elevated glucose level. (*Id.*). Plaintiff was discharged on February 22, 2007 and referred to Irene Stacy.

    2.    *Irene Stacy Community Mental Health Center: Psychiatric Evaluation: March 12, 2007*

---

[7] "Lithium affects the flow of sodium through nerve and muscle cells in the body. Sodium affects excitation or mania. Lithium is used to treat the manic episodes of manic depression. Manic symptoms include hyperactivity, rushed speech, poor judgment, reduced need for sleep, aggression, and anger. It also helps to prevent or lessen the intensity of manic episodes." Drugs.com, Lithium, *available at*: http://www.drugs.com/lithium.html (last visited 12/15/10).

[8] "Paxil is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRI). It works by restoring the balance of serotonin, a natural substance in the brain, which helps to improve certain mood problems. Paxil is used to treat depression, obsessive-compulsive disorder, anxiety disorders, post-traumatic stress disorder, and premenstrual dysphoric disorder." Drugs.com, Paxil, *available at:* http://www.drugs.com/paxil.html (last visited 12/15/10).

[9] "Lamictal is an anti-epileptic medication, also called an anticonvulsant. Lamictal is used alone or in combination with other medications to treat seizures in adults and children who are at least 2 years old. It is also used to delay mood episodes in adults with bipolar disorder." Drugs.com, Lamictal, *available at:* http://www.drugs.com/lamictal.html (last visited 12/15/10).

[10] "Bipolar II disorder" is "an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. The DSM (Diagnostic and Statistical Manual of Mental Disorders) specifies the commonly observed patterns of bipolar I and bipolar II disorder. " Stedman's Medical Dictionary 568 (28th ed. 2006).

Dr. Randon Simmons personally evaluated Plaintiff upon his referral to Irene Stacy Community Mental Health Center on March 12, 2007 (*hereinafter*, "Irene Stacy"). (R. at 227). Plaintiff had ceased taking his prescribed medications for three years prior to his admission to Butler Memorial Hospital due to financial constraints. (*Id.*). He stated that the quickest way, as he had been told, to get back on medication was to be admitted to the hospital. (*Id.*). Since being hospitalized, Plaintiff's appetite improved, and he ate three times daily, gaining five to ten pounds in the three weeks following his visit. (*Id.*). He reported no difficulty falling asleep and was attempting to regulate his sleep on a daily schedule. (*Id.*). He denied recent mood swings and rated his mood as a four on a scale of one to ten, attributing the elevation to his recent hospital visit. (*Id.*). However, he still did not have the motivation to engage in activities that he previously enjoyed. For example, he turned down an opportunity to participate in a bowling tournament to win money, because he claimed he did not have the requisite energy. (*Id.*).

Plaintiff was previously treated at Irene Stacy in the Drug and Alcohol Department in January 1989, and his case was closed after two appointments. (R. at 228). In 2003, he was treated at Community Alternatives, where he was diagnosed with bipolar disorder and depression. (*Id.*). During the 2007 evaluation, Dr. Simmons found Plaintiff to be extremely oriented, pleasant, and cooperative, but he categorized Plaintiff's mood as dysphoric,[11] including sadness and some irritability. (R. at 229). Plaintiff denied any suicidal or homicidal ideation or intent, any delusions, and any hallucinations. (*Id.*). Dr. Simmons diagnosed Plaintiff with bipolar disorder, type II, depressive type, and moderate psychosocial stressors. (*Id.*). Dr.

---

[11] "Dysphoria" is "a mood of general dissatisfaction, restlessness, depression, anxiety; a feeling of unpleasantness or discomfort." Stedman's Medical Dictionary 599 (28th ed. 2006).

Simmons also assigned Plaintiff a GAF[12] score of 45 and discontinued his lithium prescription. (*Id.*).

At Irene Stacy, Dr. Simmons personally evaluated Plaintiff on several occasions from April 9, 2007 through September 24, 2008. (R. at 291-308). During the course of treatment, Dr. Simmons determined that Plaintiff had moderate limitations regarding his restriction in the activities of daily living and difficulties in maintaining social functioning. (R. at 300). He found that Plaintiff had frequent deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, in work settings or elsewhere. (*Id.*). Similarly, he noted that Plaintiff had repeated, defined as three or more, episodes of deterioration or decompensation, each of extended duration. (*Id.*). Dr. Simmons based his reasoning for his opinions on the presence of the following evidence:

- Anhedonia or pervasive loss of interest in almost all activities
- Appetite disturbance with change in weight
- Sleep disturbance
- Psychomotor agitation or retardation
- Decreased energy
- Feelings of guilt or worthlessness
- Difficulty concentrating or thinking (R. at 298).
- Flight of ideas

(R. at 299).

---

[12] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." A GAF score of between 31-40 denotes "severe symptoms" with some impairment in reality testing or major impairments in several areas. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ..."; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

Plaintiff often reported to Dr. Simmons that his mood, while stable, should be more elevated and energetic.  (R. at 301-305, 315-317).

### 3. *Consultative Examination Report, January 9, 2008 - January 21, 2008*

Dr. Suzanne Houk personally evaluated Plaintiff at Houk Psychological Services on January 9, 2008.  (R. at 231).  She noted that Plaintiff was first diagnosed with bipolar disorder, depressive type, in 2002 after spending time in jail for failure to appear at a hearing for a traffic violation.  (R. at 232).  At the time of his visit with Dr. Houk, he was prescribed 200 mg of Lamictal and 150 mg of Wellbutrin[13] due to his regular monthly counseling sessions at Irene Stacy.  (*Id.*).  According to Plaintiff, he became preoccupied easily and often drove by places he intended to go because he was daydreaming.  He had racing thoughts and a "nervous twitch" that made him self-conscious in public.  (R. at 233).  Plaintiff stated that he went tanning regularly to elevate his mood.  (R. at 234).  Dr. Houk noted that Plaintiff appeared mildly anxious, pleasant, cooperative, and oriented to person, place, and time.  (*Id.*).  She found no evidence of psychotic thought processes.  (*Id.*).  Plaintiff was able to quickly calculate "serial sevens"[14] and repeat six digits backwards.  (*Id.*).  Plaintiff claimed he had "no ambition, no drive to do anything, no reason to do anything."  (R. at 235).

---

[13] "Wellbutrin is an antidepressant medication. It works in the brain to treat depression. Wellbutrin is used to treat major depressive disorder and seasonal affective disorder. At least one brand of bupropion (Zyban) is used to help people stop smoking by reducing cravings and other withdrawal effects." Drugs.com, Wellbutrin, *available at:* http://www.drugs.com/wellbutrin.html (last visited 12/15/10).

[14] "Serial sevens" are a test of cognitive ability in which a person is asked "to count backward from one hundred by seven for five calculations."  *Diagnostic Tools, Tests of Cognitive Abilities, Mental Status Examination,* 8 Attorney's Medical Advisor § 76:8 (2010).

According to Dr. Houk, Plaintiff was able to understand, remember, and carry out instructions affected by the impairment. (R. at 238). Plaintiff had slight restrictions for the following work-related mental activities:

- Understand and remember short, simple instructions
- Carry out short, simple instructions

(*Id.*).

Plaintiff had moderate restrictions for the following work-related mental activities:

- Interact appropriately with the public
- Interact appropriately with supervisors
- Respond appropriately to changes in a routine work setting

(*Id.*).

Plaintiff had marked restrictions for the following work-related mental activities.

- Interact appropriately with supervisor(s)
- Respond appropriately to work pressures in a usual work setting

(*Id.*).

4.    *Mental RFC Assessment and Psychiatric Review Technique: January 25, 2008*

On January 25, 2008, Dr. Phyllis Brentzel evaluated Plaintiff's file and conducted a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique. (R. at 240-243, 244-253). Dr. Brentzel found Plaintiff's statements regarding his ailments to be partially credible based on the evidence of record. (R. at 242). According to Dr. Brentzel, Plaintiff could perform simple, routine, repetitive work in a stable environment. (*Id.*). He could understand, retain, and follow simple job instructions and make simple decisions without special supervision. (*Id.*). He was self-sufficient and his social skills were functional from a psychiatric standpoint. (*Id.*). In reaching her opinions, Dr. Brentzel gave greater weight to Dr. Houk's

conclusions regarding Plaintiff's occupational and performance adjustments and less weight to personal and social adjustments. (*Id.*). According to Dr. Brentzel, Plaintiff was not significantly limited in the following areas:

- Remembering locations and work-like procedures
- Understanding and remembering very short and simple instructions
- Carrying out very short and simple instructions
- Sustaining an ordinary routine without special supervision

(R. at 240).

- Asking simple questions or requesting assistance
- Maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness
- Traveling in unfamiliar places or using public transportation

(R. at 241).

Dr. Brentzel found Plaintiff was moderately limited in the following areas:

- Understanding and remembering detailed instructions
- Carrying out detailed instructions
- Maintaining attention and concentration for extended periods
- Performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances
- Working in coordination with or proximity to others without being distracted by them
- Making simple work-related decisions

(R. at 240).

- Completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods
- Interacting appropriately with the general public
- Accepting instructions and responding appropriately to criticism from supervisors
- Getting along with coworkers or peers without distracting them or exhibiting behavioral extremes
- Responding appropriately to changes in the work setting
- Being aware of normal hazards and taking appropriate precautions
- Setting realistic goals or making plans independently of others

(R. at 241).

Ultimately, Dr. Brentzel determined that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis resulting from his impairment. (R. at 242). She diagnosed Plaintiff with Bipolar Disorder, II, depressed. (R. at 247). According to Dr. Brentzel, Plaintiff had no restriction in the activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, or pace. (R. at 254).

5.    *Consultative Examination Report, August 13, 2008*

Dr. Julie Uran, a psychologist, personally evaluated Plaintiff on August 13, 2008. (R. at 266-269). Plaintiff informed Dr. Uran that he was interested in carpentry as a means of employment and that he had been receiving Public Assistance in the form of food stamps, a medical card, and cash since March of 2007. (R. at 266). He listed several extended family members as having alcohol-related problems, but he only consumed alcohol one time per week. (*Id.*). Plaintiff noted having an occasional manic episode involving impaired concentration and diminished requirements for sleep. (*Id.*). Dr. Uran found that Plaintiff had no restriction regarding his ability to interact appropriately with supervisor(s) and co-workers. (R. at 272). She determined Plaintiff only had a slight limitation regarding his ability to interact appropriately with the public and his ability to respond appropriately to work pressures in a usual work setting. (*Id.*).

Plaintiff was cooperative during his visit, and his mood and affect were situationally appropriate. (R. at 267). Dr. Uran determined that Plaintiff had a normal thought process; however, she found evidence of extensive rumination regarding future events and potential inventions. (R. at 267). Plaintiff appeared to be guarded and suspicious of others while experiencing feelings of low self-esteem and worthlessness. (R. at 267). Dr. Uran found

Plaintiff's social judgment to be appropriate for his age, mental abilities, and education and believed he could manage his own monetary funds. (R. at 268-269). Ultimately, Dr. Uran diagnosed Plaintiff with Bipolar Disorder, Not Otherwise Specified, Alcohol Dependence in remission, Cocaine Abuse in remission, and she assigned Plaintiff a GAF score of 60. (R. at 268).

6.   *Mental RFC Assessment and Psychiatric Review Technique: September 2, 2008*

Dr. Douglas Schiller evaluated Plaintiff's case file on September 2, 2008 and conducted a Mental Residual Functioning Capacity Assessment and Psychiatric Review Technique. (R. at 274-276, 277-289). He determined that Plaintiff was capable of carrying out very short and simple instructions and had no restrictions in his ability regarding basic understanding and memory. (R. at 276). In Dr. Schiller's opinion, according to the evidence of record, Plaintiff appeared to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments. (R. at 276).

Dr. Schiller diagnosed Plaintiff with Bipolar Disorder, Not Otherwise Specified, a personality disorder, and a substance addiction disorder. (R. at 280). Dr. Schiller also determined that Plaintiff had a mild restriction of activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, or pace. (R. at 287).

7.   *Psychiatric Evaluation: August 24, 2009*

On August 24, 2009, Dr. Robert L. Eisler personally evaluated Plaintiff and diagnosed him with Rapid Cycling Bipolar Reaction.[15] (R. at 320). He found Plaintiff to be "quite guarded" and assigned him a GAF score of 30. (R. at 321). In Dr. Eisler's opinion, Plaintiff was unemployable in any full time job for one year or more as of the date of evaluation. (*Id.*). Dr. Eisler found that Plaintiff's severe bipolar reactions limited his abilities to make occupational, performance, and social adjustments. (R. at 322-323).

Specifically, Dr. Eisler determined that Plaintiff's ability to function independently and maintain personal appearance was "good." (*Id.*). Dr. Eisler determined that Plaintiff's ability was "fair" regarding the following:

- Relate to co-workers
- Deal with the public
- Maintain attention/concentration
- Understand, remember and carry out detailed, but not complex job instructions
- Understand, remember and carry out simple job instructions

(R. at 322).

Finally, Dr. Eisler found that Plaintiff's ability was "poor" or lacking altogether in the following areas:

- Follow work rules
- Use judgment
- Interact with supervisor(s)
- Deal with work stresses
- Function independently
- Understand, remember and carry out complex job instructions

(R. at 322).

- Behave in an emotionally stable manner
- Relate predictably in social situations

---

[15] "Rapid cycling" is a new specifier that may be used in connection with Bipolar I and Bipolar II Disorders, in recognition of evidence that this presentation may have implications for prognosis and treatment selection." *General Disorders, Psychiatry, Mood Disorders*, 6 Medical Advisor § 49.1 (2010).

- Demonstrate reliability

(R. at 323).

### 8.    *Administrative Hearing: September 14, 2009*

A hearing regarding Plaintiff's application for SSI and DIB benefits was held on September 14, 2009 in Seven Fields, Pennsylvania before Administrative Law Judge Brian Wood. (R. at 11). At said hearing, Plaintiff appeared with the assistance of counsel, Christine Nebel, Esquire. (*Id.*). Dr. Fred Monaco, [16] a vocational expert, also appeared to testify. (*Id.*).

Plaintiff testified that he currently lives with his parents and that he does not do any shopping, cooking, or laundry because his mother performs all of those tasks for him. (R. at 16). He used to go grocery shopping when he lived by himself in an efficiency apartment, but he only shopped at night because the stores were empty. (R. at 26). He golfs once a week and goes bowling twice a week with friends. (R. at 17, 18). He does not enjoy reading or watching movies because he does not comprehend them. (R. at 26). Plaintiff has difficulty maintaining a regular sleep schedule, and he sleeps approximately four hours a night. (R. at 20).

Plaintiff previously worked for a friend in the construction industry, but he had difficulty maintaining employment because of his lack of interest in his work in general, his regular absences, and his negative relationship with his employer. (R. at 21, 22). Plaintiff has held his current job for just over two years, but he has never performed any volunteer work because he believes he would lose interest. (R. at 13, 14). He has a general pattern of working for several days followed by several days of "laying around the house" because his body begins to hurt him.

---

[16] Dr. Monaco holds a Bachelor of Science degree from Northeastern Oklahoma University in Industrial Technology, a Master's degree from the University of Missouri in Counseling and Psychology, and a Doctorate from the University of Pittsburgh. (R. at 113). He has twenty years of experience as a vocational expert with the Social Security Administration, thirty years of experience with the Pittsburgh Board of Education as a teacher, special needs job placement coordinator/counselor, and administrative director, and fourteen years of experience in private practice supporting attorneys and others in the areas of workman's compensation and personal injury. (*Id.*).

(R. at 14-15). According to Plaintiff, his memory is not always clear, and while working at his delivery job, he often drives past his destination because he is "daydreaming." (R. at 20). He becomes quite irritated and stressed while in daily traffic and does not believe he is capable of a full-time delivery job for this reason. (R. at 24, 25).

Dr. Monaco, a vocational expert, testified next regarding Plaintiff's ability to work based on the record and the opportunities that may be available to Plaintiff in the national economy. (R. at 27). Dr. Monaco classified Plaintiff's position as a carpenter as "skilled" and his positions as a maintenance worker, steel blaster, and delivery driver as "semi-skilled." (R. at 28). Assuming that an individual of Plaintiff's age, education, and work experience is limited to carrying out short, simple instructions, performing simple tasks, and requiring a low stress work setting, defined as occasional decision making and occasional changes in the work setting, Dr. Monaco opined work existed in the national economy for such an individual. (R. at 28-29). Representative examples fulfilling these requirements include sedentary positions, for which 115,000 positions exist, document preparers, for which 300,000 positions exist, and cleaners, for which 2.2 million positions exist in the national economy. (R. at 29).

Assuming that the same individual is limited to jobs that require no judgment and are low stress, defined as no decision making; permitted no changes in work setting; and allowed more than four absences per month, Dr. Monaco stated that "substantial gainful activity on a sustained basis would be impossible." (*Id.*). If an individual had poor or no ability to deal with work stresses, follow work rules, or demonstrate reliability, Dr. Monaco found he would generally not be able to engage in substantial, gainful activity. (R. at 30). Similarly, if an individual had marked impairment in his ability to interact appropriately with supervisors and respond

appropriately to changes in the work setting, he would be unable to engage in substantial, gainful activity. (R. at 31).

### 9. *ALJ's Decision: October 7, 2009*

The ALJ issued his decision on October 7, 2009, concluding that Plaintiff is not under a disability within the meaning of the Social Security Act from November 26, 2006, and thus, he determined that Plaintiff was not entitled to SSI or DIB. (R. at 41). In so holding, the ALJ made the following determinations: 1) Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2012 (R. at 43); 2) Plaintiff has not engaged in substantial gainful activity since November 26, 2006, the alleged onset date [...] (*Id.*); 3) Plaintiff has the following severe impairment: bipolar disorder [...] (*Id.*); 4) Plaintiff does not have an impairment or combination of impairments that meets or medically equates one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. at 44); 5) Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but is limited to carrying out short, simple instructions, performing simple tasks, and performing low stress jobs, defined as jobs involving only occasional decision making and occasional changes in the work setting (R. at 45); 6) Plaintiff is unable to perform any past relevant work (R. at 48); 7) Plaintiff is a younger individual age 45-49 as of the alleged disability onset date (*Id.*); 8) Plaintiff has at least a high school education and is able to communicate in English (*Id.*); 9) Transferability of job skills is not material to the determination of disability because under Medical-Vocational Rules, Plaintiff is "not disabled," regardless of presence of transferable job skills (*Id.*); 10) Considering Plaintiff's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that Plaintiff can perform (*Id.*); and 11) Plaintiff has

not been under a disability, as defined in Social Security Act, from November 26, 2006 through the date of this decision (R. at 49).

While Plaintiff's work did not rise to the level of substantial gainful activity, the ALJ found his work as a delivery driver to be indicative of his ability to perform work activity. (R. at 43). The ALJ found that Plaintiff only had mild restrictions in the areas of daily living and social functioning, moderate difficulties regarding concentration, persistence or pace, no episodes of decompensation, and no areas of "marked" limitation, hence Plaintiff's condition does not rise to the level of an impairment. (R. at 44). The ALJ noted that while Plaintiff claimed he was unable to work a full time job, he worked part time and participated in various recreational activities such as golf, bowling, softball, and tanning. (R. at 46). The ALJ also noted Plaintiff's positive response to medications. (*Id.*).

In reaching his conclusion, the ALJ gave greater weight to the opinions of Doctors Uran, Brentzel, and Schiller and assigned less weight to the opinions of Doctors Houk, Simmons, and Eisler. In fact, the ALJ found that Dr. Uran's opinion was based upon clinical findings and supported by the record as a whole. (R. at 47). He also determined that the evaluation conducted by the State agency mental health experts, Dr. Brentzel and Dr. Schiller, was supported by the evidence of record. (R. at 46-47). According to the ALJ, Dr. Houk's opinion was entitled to less weight because it was not supported by the evidence of record and appeared to be based on Plaintiff's subjective allegations. (R. at 47). The ALJ gave less weight to Dr. Simmons' opinion because he determined that it was based on conclusory statements without clinical evidence or findings and was not consistent with the evidence. (R. at 47). The ALJ also

gave less weight to Dr. Eisler's opinion because he found that it was not supported by the evidence. (R. at 47).

## V.    DISCUSSION

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because 1) the ALJ improperly disregarded the medical opinion of Plaintiff's treating and examining physicians, 2) the ALJ incorrectly found that Plaintiff did not meet an impairment listed in the listings of impairments in Appendix 1, Subpart P, Regulations No. 4, 3) the ALJ improperly determined Plaintiff's residual functioning capacity, and 4) the ALJ improperly disregarded the testimony of the vocational expert and relied on an incomplete hypothetical question. (Docket No. 10 at 8, 12, 14, and 15). Plaintiff requests summary judgment, or in the alternative, that this Court remand the matter to the Commissioner for further proceedings. (Docket No. 10 at 16). The Commissioner argues that substantial evidence supports the weight that the ALJ gave to all of the medical opinions, the ALJ's formulation of Plaintiff's residual functioning capacity and the hypothetical question to the vocational expert, and the ALJ's finding that Plaintiff did not meet or equal a listed impairment. (Docket No. 12 at 8). The Court will address each of these arguments, in turn.

### A.    *The ALJ Adequately Considered All Medical Opinions*

As to the first issue, Plaintiff argues that the ALJ failed to properly consider the opinions of his treating physician, Dr. Simmons, and the examining physicians, Dr. Eisler and Dr. Houk. (Docket No. 10 at 7-11). The ALJ must evaluate all medical opinions in the record. 20 C.F.R. § 404.1527(d). There are several factors that the ALJ may consider when determining what weight to give medical opinions. 20 C.F.R. §§ 404.1527, 416.927(d)(2). When evaluating a treating

physician's opinion, the ALJ considers the "length of the treatment relationship and the frequency of examination" and "nature and extent of the treatment relationship." 20 C.F.R. § 404.1527(d)(2). "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, for controlling weight to be given to the opinion of a treating physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and […] not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(d)(2), 416.972(d)(2). An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but also may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985).

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose what evidence to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ must consider all the medical evidence and give some reason for discounting the evidence he rejects. *Stewart v. Secretary of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (explaining that "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them").

In the ALJ's decision, he gave little weight to Dr. Simmons' statements regarding Plaintiff's disability, holding that his opinions were not supported by the evidence of record. This Court agrees. Dr. Simmons submitted several statements of disability on the claimant's behalf, including two check-the-box welfare forms in which Dr. Simmons stated that Plaintiff was temporary disabled with bipolar disorder, without more detail. (R. at 220, 327). He also submitted a psychiatric assessment form stating that Plaintiff was unable to obtain and sustain full-time employment. Dr. Simmons' other records are inconsistent with the disability findings in these forms. Indeed, Dr. Simmons' notes reflect that at that time his opinions were rendered, Plaintiff was still employed by the meat market, played golf after work, maintained a stable mood, and bowled frequently. (R. at 297, 301-305). Dr. Simmons even reported that Plaintiff was busy at work, worked full time for a two-month period, and his mood had elevated. (R. at 315-318). His reports show that Plaintiff's impairments actually improved with treatment. (R. at 301, 307, 316, 318). Given this inconsistent evidence, the ALJ properly concluded that Dr. Simmons' statements of disability were entitled to little weight because they were not supported by the evidence of record especially the Plaintiff's activities of daily living. (R. at 47). Moreover, the ALJ thoroughly considered Dr. Simmons' opinion in contrast to the other conflicting evidence of record and gave sufficient reasons for discounting that opinion.

Similarly, the ALJ was within his authority to determine that Dr. Simmons' opinions of temporary disability submitted to the Pennsylvania Department of Public Welfare on Plaintiff's behalf were entitled to little weight because they were not supported by substantial evidence. (R. at 47, 219, 326). These reports have minimal value because the Department of Welfare applies its own standards for disability. 20 C.F.R. §§ 404.1504, 416.904; *see also Hartranft v. Apfel*,

181 F.3d 358, 362 (3d Cir. 1999) (providing that an ALJ may reasonably disregard a report made in connection with another benefits program). In addition, "form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best" of disability, and when they are "unaccompanied by thorough written reports, their reliability is suspect." *Mason*, 994 F.2d at 1065. A review of the record as a whole reveals that the ALJ did point to sufficient evidence to contradict Dr. Simmons' opinions. Therefore, it was not in error for the ALJ to give Dr. Simmons' report little weight.

The ALJ also did not err in giving little weight to the assessment of Dr. Houk, the consultative examiner. While Dr. Houk found that Plaintiff had marked limitations in his ability to interact appropriately with supervisors and to respond to work pressures in a usual work setting, the ALJ found that this opinion was not supported by the evidence of record. (R. at 47, 231, 238). Specifically, the ALJ supported his rejection of this opinion, citing other evidence in the record that Plaintiff had maintained work for two years, could respond to work pressures, and did not have difficulty interacting with his supervisor at his current position. (R. at 234). Additionally, the ALJ noted Dr. Houk's record of Plaintiff's socialization with his friends and his variety of hobbies. (*Id.*). In sum, the ALJ did not err in his assessment that Dr. Houk's findings were not supported by substantial evidence, and provided sufficient reasoning to reject her opinion. 20 C.F.R. § 404.1527(d).

This Court further agrees that the ALJ's determination that Dr. Eisler's opinion was entitled to little weight is supported by substantial evidence. Dr. Eisler opined that Plaintiff was disabled, noting that he was previously admitted to Butler Memorial Hospital for suicidal ideation and was socially avoidant. (R. at 321, 223, 227). The ALJ rejected Dr. Eisler's opinion

as inconsistent with the record. (R. at 47). Instead, the ALJ pointed out that the hospital records show that upon admission, Plaintiff did not report suicidal ideation. (R. at 227). In fact, the Plaintiff reported that admission to the hospital was the best way to get medication that he could no longer afford. (R. at 223). As to the statement that Plaintiff was socially avoidant, the ALJ found this inconsistent with his many group activities, including a bowling league, softball, golfing, and social outings with friends. (R. at 47, 234, 301). Hence, the ALJ provided sufficient reasoning to reject the opinion.

This Court also finds that the ALJ's determination to give greater weight to Dr. Uran's opinion is supported by substantial evidence. (R. at 47, 269). Dr. Uran found that Plaintiff had a GAF score of 60, indicating moderate symptoms. (R. at 268). She observed Plaintiff had little restrictions in his ability to understand, remember, and carry out instructions and no restriction in his ability to interact with supervisors and co-workers. (R. at 272). Dr. Uran also found that Plaintiff was capable of managing personal funds without assistance. (R. at 269). The ALJ noted Dr. Uran's finding that despite Plaintiff's claim that he could not maintain full-time employment because he could not get out of bed, he was consistently employed part-time with no absences for a nine month period preceding the evaluation. (R. at 266). The ALJ also accepted Dr. Uran's report that Plaintiff could respond to work pressures and gave no indication of difficulty with supervisors based on his subjective allegations. (R. at 272).

The ALJ further found that consistent with Dr. Uran's opinions, the agency mental health experts, Dr. Brentzel and Dr. Schiller, determined that Plaintiff is capable of meeting the demands of competitive work and performing simple work tasks. (R. at 240, 276). As discussed below, the ALJ also accounted for Plaintiff's capabilities in his residual functioning capacity

determination. (R. at 242, 276). In sum, the ALJ weighed all of the conflicting medical opinions on the record and provided sufficient reasoning for the weight given to each of these opinions. Thus, his assessment of the medical evidence is properly supported.

### B. The ALJ Properly Determined that Plaintiff Did Not Meet a Listed Impairment

Plaintiff next argues that he clearly met the requirements of Listing 12.04 for Affective Disorders [17] and contends that the ALJ failed to consider Dr. Simmons' report in determining whether Plaintiff met or equaled Listing 12.04. (Docket No. 10 at 14). Listing 12.04 consists of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations) and paragraph C criteria (a set of additional functional limitations). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. In the instant case, the ALJ determined that Plaintiff did not meet the B or C criteria of the listing. (R. at 44-45). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment

---

[17] Listing 12.04 for Affective Disorder defines the condition as follows: "Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied or when the requirements in C are satisfied."

Criteria B and C consist of the following:
    B. Resulting in at least two of the following:
        1. Marked restriction of activities of daily living; or
        2. Marked difficulties in maintaining social functioning; or
        3. Marked difficulties in maintaining concentration, persistence, or pace; or
        4. Repeated episodes of decompensation, each of extended duration; or
    C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
        1. Repeated episodes of decompensation, each of extended duration; or
        2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
        3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing of Impairments – Adult Listings (Part A), 12.00 Mental Disorders; available at: http://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm#12.04 Affective Disorders (last visited 12/15/10).

that manifests only some of those criteria, no matter how severely, does not qualify." *Jones v. Barnhart*, 364 F.3d 501, 504 (3d Cir. 2004) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original)). An ALJ's "bare conclusory statement[s] for a decision that an impairment does not match or is not equivalent to a listed impairment are insufficient." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000).

In this case, the ALJ's decision, read as a whole, demonstrates that the ALJ considered the appropriate factors in reaching the conclusion that Plaintiff's impairment did not meet the requirements for the listing of affective disorders. Plaintiff maintains that the ALJ improperly disregarded Dr. Simmons' notation that Plaintiff suffered from multiple episodes of decompensation. However, Dr. Simmons' report is merely a "check a box" form, which includes no explanation of any episodes of decompensation. *See Mason*, 994 F.2d at 1065 (holding that "form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best"). Absent Plaintiff's short inpatient stay at Butler Memorial Hospital, there is no evidence of repeated episodes of decompensation of extended duration in the record. Thus, the ALJ properly rejected this evidence as inconsistent with the medical records as a whole.

Moreover, as discussed above, the ALJ's findings relative to the medical evidence and reports of Plaintiff's activities of daily living including his part-time work and social endeavors sufficiently demonstrate that the remaining paragraph "B" criteria were not met. (R. at 44, 199, 169, 25, 223-228).

Similarly, the ALJ properly considered the record and sufficiently supported his decision that the paragraph "C" criteria were not met. There is no medical support for a finding that the remaining criteria applied in Plaintiff's case. (R. at 44).

In this Court's estimation, the ALJ's discussion of Plaintiff's medical history in relation to his finding that Plaintiff did not meet a listed impairment contains sufficient explanation to provide meaningful review.  *Burnett*, 220 F.3d at 119-20; s*ee also Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (the ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion).  Therefore, the ALJ did not err in his determination.

C. ***Substantial Evidence Supports the ALJ's Residual Functioning Capacity and the Hypothetical Question to the Vocational Expert***

Plaintiff further argues that the ALJ improperly determined Plaintiff's residual functioning capacity which led to an incomplete hypothetical question presented to the vocational expert.  Plaintiff suggests that the ALJ should have considered the opinions of Doctors Eisler, Houk, and Simmons in both his residual functioning capacity determination and his hypothetical question.  (Docket No. 10 at 15).

The residual functional capacity is an administrative, and not a medical finding.  This determination is specifically reserved for the ALJ.  20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The United States Court of Appeals for the Third Circuit has held that it is normally the case that this conclusion is based in large measure on the testimony provided by the vocational expert. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  "Residual functional capacity [RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)).  A claimant's RFC represents the most, not the least, that a person can do despite

his or her limitations.  *See Cooper v. Barnhart*, 2008 WL 2433194, at *2 n. 4 (E.D. Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)).

In determining a person's RFC, an administrative law judge must consider all evidence of record.  20 C.F.R. § 416.920.  Although an administrative law judge can weigh the credibility of the evidence when making an RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so.  *Burnett*, 220 F.3d at 121.  As the Court of Appeals stated in *Burnett*, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"  *Id.*  (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).  The Commissioner must also consider all of the evidence of record in making a residual functional capacity determination.  *Burnett*, 220 F.3d at 121 (citing *Plummer*, 186 F.3d at 249; *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir.1986)).  The evidence of record includes all medical records, as well as "observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001).

After the ALJ found that Plaintiff's impairment did not meet or equal a listed impairment, he considered and made a finding about his residual functional capacity based on all the relevant evidence in the case record.  20 C.F.R. § 404.1520(e).  In determining the residual functioning capacity, the ALJ evaluated the evidence of record and considered Plaintiff's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence.  (R. at 45).  Specifically, the ALJ considered Plaintiff's allegations in terms of his activities of daily living, the location, duration, frequency, and intensity of the symptoms, factors that precipitate or aggravate the symptoms, the type of medication he used and any side

effects, other treatment the claimant has received, any measures the claimant used for symptom relief, and any other factors concerning claimant's alleged restrictions.  (R. at 45).  To this end, the ALJ noted that Plaintiff works part-time and that prescribed medication improves Plaintiff's mood.  (R. at 45-46).  The ALJ also considered Plaintiff's variety of hobbies and his adherence to a consistent schedule.  (R. at 46).  In this Court's estimation, his finding of residual functional capacity was proper.

Plaintiff also claims the ALJ ignored testimony from the vocational expert to the extent that it relied on the opinions of Doctors Eisler, Houk, and Simmons.  (Docket No. 10 at 15).  The ALJ may disregard any answer to a hypothetical question provided by the vocational expert that he or she finds is not credibly supported by the record.  *See Jones v. Barnhart*, 364 F.3d 501, 506 (3d Cir. 2004) (stating that "because the hypothetical was inconsistent with the evidence in the record, the ALJ had the authority to disregard the response").  As discussed above, the ALJ found that the opinions of Doctors Eisler, Houk, and Simmons were entitled to less weight and unsupported by the record.  Accordingly, this Court finds that the ALJ's decision to reject the portion of the vocational expert's testimony which relied on the opinions of Doctors Eisler, Houk, and Simmons was likewise proper.

## VI.    CONCLUSION

Based upon the foregoing, Plaintiff's Motion for Summary Judgment (Docket No. 9) is DENIED and Defendant's Motion for Summary Judgment (Docket No. 11) is GRANTED.  An appropriate Order and Judgment follow.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: December 15, 2010

cc/ecf: All counsel of record.